No. 53.—MARTIN W. STAMPER *et al.* plaintiffs in error, *vs.* JOHN B. GRIFFIN, defendant.

[1.] In ejectment, a writing is not admissible in evidence, whether the object be to rely on it as genuine, or to rely on it as spurious, until some evidence has been given, either that it is genuine or that it is spurious; and be the object which it may, if there is a subscribing witness to the writing, it ought not to be received until he has been examined, or some excuse has been given for the failure to examine him.

[2.] One who holds land under a bond for titles, in the name of the true owner, does not, as long as the purchase money remains unpaid, hold adversely to the true owner, even although the bond be a forgery, provided he believes it to be the bond of the true owner; but, one who holds under a bond for titles, in the name of the true owner, does hold adversely to the true owner, if the bond was made by a person personating the true owner, and believed, by the obligee, to be the true owner, but made by that person as his own bond.

[3.]. He who has the title to land, is to be deemed to be in the seizin and possession of it, and to continue so until ousted thereof by an actual posses-

sion in another, under a claim of right. The possession of one who enters, disclaiming title, is to be considered as a possession by the consent of him who has the title; nor will a continuance of this possession avail to mature a title under the Statute of Limitations, until the character of the possession has been changed, either by a declaration to that effect, communicated to him who has the title, or by the exercise of acts of ownership, inconsistent with a tenancy by the consent of him who has the title.

Ejectment, in Talbot.    Tried before Judge POWERS, March. Term, 1856.

Martin W. Stamper brought his action of ejectment against, James B. Griffin for lot of land No. 207, in the 22d district. of said county.

The following is a brief of the evidence introduced on the trial:

Plaintiffs read to the Jury a grant from the State in due. form to the lot of land in dispute, No. 207, in the 23d(?) district of originally Muscogee, now Talbot County, to Daniel. Zettler, of McDonnel's district, Chatham County, dated December 11th, 1832; also, a deed from Daniel Zettler to Martin W. Stamper to said premises, dated October 7th, 1847,. with warranty in usual form, and consideration expressed therein of $5 00; and also, offered the admissions of the defendant, that defendant was in possession of said premises at the time of commencement of said suit.    And here plaintiffs. rested their case.

The defendant (plaintiffs objecting, and the objection overruled by the Court) read to the Jury a bond with the assignment thereon, a copy of which is as follows, to-wit:

GEORGIA, HARRIS COUNTY:

Know all men by these presents, that I, Daniel Zettler, of' Chatham County, am held and firmly bound by these presents, do bind myself, my heirs and assigns, in the just sum of six hundred dollars, lawful money, to Joseph Morris, of the county and State aforesaid.    The condition of the above

obligation is such, that if the said Daniel Zettler shall make, or cause to be made, good and sufficient titles to a lot of land in *fee simple*, in Muscogee, now Talbot County, known in said plan of lottery by No. two hundred and seven, in the twenty-second district of said county, on or before the 25th day of December, eighteen hundred and thirty-seven, then the above obligation to be null and void; otherwise, in full force and virtue, as witness my hand, this 18th November, 1837.

(Signed,)        DANIEL ZETTLER."

DANIEL MORRIS.

I assign the within bond to John Rush without any recourse on me or my heirs, April 7th, 1837.

JOSEPH MORRIS.

I assign the within bond to Reuben Hearndon, as my agent, this the 11th day of January, 1842.

JOHN RUSH.

The defendant then read the interrogatories of John Felenberger, who testified, that he had known Daniel Zettler all his life, and was well acquainted with him and his handwriting and signature, from having seen him write. A bond for titles to land purporting to be made by said Zettler, was shown to witness at Talbotton, in Talbot County, in Judge Hill's office, during the September Term of Talbot Superior Court, in 1850. Witness examined the signature carefully, and it was not the signature of Daniel Zettler; said bond was shown to me by B. Hill and J. Johnston, Esqrs. at the time and place as above stated, and was the only bond shown to me by any one during my stay at that place; Daniel Zettler is about 5 feet 6 inches in height, and weighs about one hundred and fifty pounds; his complexion is very dark, black hair, and witness thinks, about fifty years of age; he is quite deaf, and has been so for some time; and in conversation, generally, is slow of speech; witness lives in Savannah, and has lived there since September, 1850; and witness is not in the employment of Zettler, and never has been in his service; witness went to Talbotton at the request of his brother, to

see the bond; Mr. Zettler had written to my brother to go, but as it was not in his power to do so, my brother sent me; my expenses to Talbotton and back to Savannah, were paid by Mr. Zettler; beyond that, I was paid nothing, as I charged nothing; Daniel Zettler's parents are Dutch, but he was born in Chatham or Effingham County, in Georgia; cannot say whether he has a brogue—he may have, although I never detected it, as I also am descended from Dutch parentage, though native born; I am not related by blood to Zettler; his wife is my half sister, which is the only connexion between us; it was admitted by plaintiffs that the bond shown——— is the original of the bond copied in this brief of evidence.

The defendant then introduced the testimony of GEORGE W. KELLUM, who testified, that in March, 1838, Benjamin Booty went into the possession of the lot of land in dispute, and moved on it as a squatter, because he had no where else to go; some short time afterwards, and during the same spring, and witness thinks, not more than twenty days after Booty moved on the land, Booty told witness that he had leased the land of John Rush for five years, and was to clear 20 acres and build cabins; Booty lived on the place until his lease was out, and cleared about 20 acres of land; some time in January, 1843, Glanton went into possession of the land, Booty going out of possession, and Glanton occupied some three or four years, and was followed in the possession by Griffin, the defendant, who continued in possession until the commencement of this suit; and the land was in the woods and vacant when Booty first went into possession; Booty, Glanton and Griffin have been the only occupants of the land, so far as witness knows.

KELLUM cross-examined, testified, that it might have been early in the summer when Booty told him that he leased the land from Rush; it was in the spring or summer of 1838; when Booty went into the possession of the land, he did not claim the claim, nor did he claim any right to the possession thereof.

Defendant then read to the Jury the testimony of JOHN

RUSH, who testified, that he knows lot of land No. 207, in the 22d district of Talbot County; he once owned the land; he purchased it of Joseph Morris; Morris transferred to him the title bond; the title bond was made by Daniel Zettler; at the time witness purchased the land, Booty was in possession of the land, and had been there 20 days; Booty did not pretend to claim the land in his own right; he told witness he only settled as a squatter; it was a vacant lot, and he settled it because he had no where else to go; witness leased the land to Booty for five years; Booty was to clear 20 acres and put it under good fence, and build common log cabins; witness gave him a written lease for the same; Booty came to witness for a lease; he told witness he had no showing on the land, and wanted witness to grant him a showing to live on it; witness gave him a lease in writing for five years, including the present year; the said Booty was to do the above stated amount of work to pay witness for the use of the place; witness believed that he should get a good and *valid* title, at the time he purchased it; witness claimed it as his own right and property, and paid taxes for it a number of years, under said bond; it was the same bond exhibited to me on the former trial—the Zettler bond; it was, by virtue of said bond, that he leased the land to Booty; Booty owned it five years as witness' tenant in possession; Booty never had any lease or right from any other person except witness, nor never pretended to have; witness transferred the bond to Herndon, as witness' agent, to get a title from Zettler to witness, which he agreed to do, but he went off and never returned to witness.

No man ever demanded the land of witness. Witness held it as his own right and property until it was sold by the Sheriff to pay a part of the note given for the land; witness purchased it in good faith; witness held it in good faith, and Booty was witness' tenant for five years, until it was sold for a part of the notes given for said land; the Sheriff dispossessed Booty and put Glanton in possession.

It never was demanded of witness by Zettler nor any per-

·son while witness owned it.　Defendant read to the Jury a ;Sheriff's deed, in the usual form and properly executed, ;bearing date November 16, 1842, reciting that the land was ;sold as the property of John Rush September 7, 1842, under *fi. fas.* from Talbot Superior Court, James A. Jeter plaintiff and John Rush defendant; also, reciting that the land was bid off by Wm. T. Glanton, for thirty dollars; and the deed was from Thomas U. Robinson, Sheriff, to said Glanton. Also, a deed made by James K. Giddens, Sheriff of Talbot County, to John B. Griffin, dated December 3, 1845; land sold at Sheriff's sale as the property of said Glanton, De-·cember 2, 1845, for the sum of eighty dollars; the deed duly ·executed and recorded June 20, 1854.

The defendant introduced WILLIAM HALL, who testified, that in the fall of 1842, when the land was sold at Sheriff's ·sale as the property of John Bush, witness bid off the land, ;and afterwards turned over the bid to Glanton; and some time early in January, 1843, the Sheriff turned Booty out and put Glanton into possession of the land; witness was well acquainted with the land and lived within 5 or 6 miles ·of it.　Booty, Glanton and Griffin are the only persons he ·ever knew in possession of the land; the land was in the woods and vacant previous to Booty's possession.

●Here defendant rested his case.

Plaintiff, in rebuttal, read to the Jury the *fi. fa.* under which the land was sold as the property of John Rush; also, the judgment upon which the same was founded, and the promissory note, the cause of action of the judgment—the promissory note, a copy of which is as follows:

"On or before the 25th of December, 1838, I promise to pay to Joseph Morris, or bearer, the sum of seventy-five dollars, for value received of him the 7th day of April, 1837."
　　　　　　　　　　　　　　　　JOHN RUSH."

The suit was to Talbot Inferior Court, June Term, 1840, ·and the judgment December Term, 1841.　On appeal in

Talbot Superior Court, the *fi. fa.* was in the usual form, dated December 7, 1841, and has thereon these entries:

"Levied the within *fi. fa.* upon one lot of land, No. not known, lying in the 23d (?) district of Talbot County, containing 202½ acres, more or less—levied on as the property of John Rush, this 30th July, 1842.   Sept. 7, 1842.

JAMES K. GIDDENS, D. S."

The above levy sold for thirty dollars—thirteen dollars and ninety-two cents costs to be deducted—credit $16 06¼.

THOS. U. ROBINSON, Sh'ff."

"Received of John Rush seventy dollars, in part, on the within *fi. fa.*   Oct. 31st, 1842.

THOS. U. ROBINSON, Sh'ff."

"Received of John Rush five dollars and fifty cents on the within *fi. fa.*   Dec. 24th, 1842.   Received of John Rush eight dollars, in full, of this *fi. fa.*   20th Feb. 1843.

J. K. GIDDENS, D. Sh'ff."

Plaintiff offered to the Jury the testimony of JOHN MALPASS, who testified, that in 1842, after the Sheriff's sale and while Booty was in possession of the land, Booty told witness that he had been notified to hold, and was holding, the possession of the land for the true owner.

Plaintiff then read to the Jury the testimony of JOSEPH MORRIS, taken by interrogatories, who testified, that he knew the parties, and that he did purchase lot of land No. 207 in the 22d district of originally Muscogee, now Talbot County, of a man by the name of Daniel Zettler, and that he took a bond for titles to said land, witnessed by Daniel Morris, and that he had answered interrogatories taken out by the defendant in the above stated case; that he was to give $200 for said land; that he did not pay any money down, but gave his note for the amount, payable to Daniel Zettler individually—not to Daniel Zettler or bearer—to be paid the christ-

Stamper *et al. vs.* Griffin.

mas following; and that the note was given early in the year 1836; but that he does not recollect the month; and that he traded off the bond to one John Rush, and that said Rush was to take up the note when presented, and that he holds said Rush's written obligation for the same. Witness only gave Zettler one note, and that he did not buy a horse from Jarrett for witness' note.

The cause being submitted to the Jury, a verdict was found for the defendant, and the plaintiff moved a rule for a new trial, on the following grounds:

1st. Because the Court admitted in evidence, over the objection of plaintiff, the bond purporting to have been made by Zettler, and which is set out in the brief of testimony, without proving the same by the subscribing witness, and without accounting for the absence of the testimony of the subscribing witness.

2d. Because the Court, though requested in writing by the plaintiff, refused to charge the Jury, that if Rush went into possession of said land under a bond for titles purporting to have been made by Zettler; and that if he, Rush, believed at that time that said bond was genuine and not forged; yet, if the purchase money was not paid until he, Rush, claimed title to the land under said bond alone, while in possession, his, Rush's possession, was not adverse to the title of said Zettler, but was an admission of Zettler's right to the land, though the bond might have been a forgery.

3d. Because the Court refused to charge the Jury, though requested in writing by plaintiff, that if Booty went into possession of said land as a squatter, that then, before he, Booty, could attorn to Rush or any one else but the true owner, he, Booty, must have given notice to the true owner that he had ceased to hold the land in that capacity; and that if he failed to give in some way such notice, and did attorn to or lease such land from said Rush, Rush not being the true owner of said land, the possession of Rush, thus acquired, no notice being given, was not adverse to the title of the true owner.

4th. Because the Court refused to charge, when requested!

in writing by plaintiff, that if Rush, while in possession of said bond, whether forged or genuine, assigned said bond to one Herndon, as his agent, to get a title thereto from Zettler, then such possession by Rush was not adverse, but was an acknowledgment of the title of said Zettler to said land.

5th. Because the Court charged the Jury, that if they should believe the bond purporting to have been made by Zettler to be a forgery; and if Rush, in good faith, claimed said land under said bond, then his possession was adverse, whether the purchase money was paid or not paid.

6th. Because said verdict is contrary to the evidence and the weight of evidence.

7th. Because the verdict is contrary to law.

The Court over-ruled the motion on all the grounds, and Counsel for plaintiff excepted.

B. Hill; J. Johnson, for plaintiff in error.

Smith & Pou, *contra.*

*By the Court.*—Benning, J. delivering the opinion.

Possession, to be available as a defence under the Statute of Limitations, must be adverse to the title of the true owner, and must be held under a *bona fide* claim of right and color of title.

A forged writing may be the foundation of a *bona fide* claim of right and color of title; but not without it is believed to be a genuine writing.

Of course much more may a genuine writing be such foundation.

But, in ejectment, no writing can be received in evidence as a genuine writing, until it has been proved to be a genuine one, and none as a forgery until it has been proved to be a forgery. A writing, of itself, is not evidence of the one thing or of the other. A writing, of itself, is evidence of nothing,

and therefore is not, unless accompanied by proof of some sort, admissible as evidence.

And whether the object be to prove that a writing is genuine, or that it is spurious, the subscribing witness, if there be one, and he accessible, ought to be called; for he, it is to be presumed, is the person who knows better than all others that the writing is genuine, if it is genuine, and spurious if it is spurious.

[1.] We think, therefore, that the Court erred in not excluding the bond introduced by the tenant in this case, until the subscribing witness to it had been called, or some excuse had been given for not calling him.

Possession, to be available under the Statute of Limitations, has to be adverse to the title of the true owner.

The possession of no person can be adverse to the title of the true owner, unless the person *intends* it to be adverse to that title.

No·one can intend a possession to be adverse to the title of the true owner, which possession he considers himself as holding *under* the true owner.

Every one who holds his possession under a bond for titles made by the true owner must, if the purchase money remains, unpaid, consider himself as holding under the true owner.

Therefore, no one who so holds, can intend his possession to be adverse to the title of the true owner. And therefore, the possession of no one who so holds, is adverse to that title.

So, equally, every one who holds his possession under a bond for titles not made by the true owner, but which he believes to have been made by the true owner, and not by some man personating the true owner, must, if the purchase money remains unpaid, consider himself as holding under the true owner. That must be his *thought*, if he believes the bond to be genuine, whether it be genuine or not.

Therefore no one who so holds, can *intend* his possession to be adverse to the title of the true owner; and therefore, the

possession of no one who so holds is adverse to the possession of the true owner.

In these two sorts of possession, the result is precisely the same, whether the bond be spurious or genuine, because in these two sorts, the *intent* of the holder is the same. In each, he intends his possession to be a possession under the true owner. And intending this, he cannot intend the possession to be adverse to the true owner's title.

But any possession may be adverse to the title of the true owner if the holder of that possession intends it so to be.

And every holder of possession, it is to be presumed, intends the possession so to be, if he holds it under a person who, though not the true owner, claims adversely to the true owner.

And a person who sells land as his own claims the land adversely to the true owner, although in the sale he may *personate* the true owner, and use a name as his own that is the name of the true owner. He says, in effect, I am the true owner, and the name on which the title stands is my name.

And the person that would be the purchaser from him, would of course claim and hold the land as he had claimed and held it; that is, adversely to the title of the true owner.

To illustrate: C is the owner of a lot of land. A goes to B and says to him, that he is agent for C to sell the lot, and sells the lot to B, with the understanding that the title is to be made by C, when the purchase money shall have been paid by B, and that he is to get from C for B C's bond to that effect. A brings a bond to B, with C's name signed to it, and delivers it as the bond of C. The bond is a forgery. B takes possession under it. B does not hold adversely to C, because he *thinks* he is holding under C; and so thinking, it cannot be supposed that he *intends* to hold adversely to C.

But take the case to be, that what A says to B is, that he, A, is C, and that as C he sells to B the lot; and as C, makes the bond and delivers the possession of the lot. B, in this case, holds adversely to C, because he *thinks* he is *holding*

*under A*, although he also thinks that A is C, and thinking that he holds under A, it is to be supposed that he *intends* to hold under A; and therefore, intends to hold adversely to C.

All which being so, these consequences follow in respect to this case.

[2.] If Rush and his assignees held the land under a bond really made by Zettler, the drawer, and the purchase money remained unpaid, they did not hold the land adversely to Zettler's title.

[2.] If they held under a bond in Zettler's name, though not made by Zettler, but which they believe to have been made by him, and not to have been made by some other person whom they took to be him, they did not hold adversely to his title.

[2.] But if they held under a bond which was made by some other person than Zettler, but which was made by that person as *his own* bond, and not as Zettler's bond, they did hold adversely to Zettler's title, although that person might, in making the bond, have *personated* Zettler.

And these, we think, are the three propositions which the Court should have given in charge to the Jury, instead of the proposition which it did give in charge to them. There is evidence to warrant the giving of each of them.

And they cover the grounds covered by all the requests to charge, except one.

And these propositions contain nothing inconsistent with the decision made in this case when it was last before this Court. The *decision* then made, was merely that certain testimony was not irrelevant, viz: testimony to show that the signature to the bond was a forgery, and to show, by a description of Zettler, *that the person who gave the bond must have been a different person from him.* This was the decision, and this is entirely consistent with what we now say. If there are any expressions in the opinion that go beyond this, they of course do not, as authority, rank with the decision which says this.

The part of the requests not thus disposed of, is that con-

tained in the third of the grounds taken for a new trial. As to that, we say that we consider the proposition contained in that to be substantially true.

[3.] "The law, however, deems every person to be in the legal seizin and possession of the land to which he has a perfect and complete title; and this seizin and possession is co-extensive with his right, and continues till he is ousted thereof by an actual possession in another, *under a claim of right.* This may be considered a settled principle of the Common Law, and has been recognized and adopted as such by the Supreme Court of the United States." "So long, for instance, as the possessor declares that he holds in subordination to the better title, the possession will be regarded as held by consent; nor will a continued possession, after such declarations, avail to mature a title under the Statute of Limitations, until the party has changed the character of his possession, either by express declaration or by the exercise of acts of ownership inconsistent with a subordinate character." (*Ang. Lim. ch.* 31, *sec.* 5.)   And see *ch.* 33, *sec's* 1, 5, 6, 7, 8, 9; *ch.* 32, *sec.* 11.

This we regard as a correct statement of what the law is, on the subject to which it refers.

Therefore, we think that if Booty entered as " a squatter" —entered disclaiming title, he was to be considered as holding the possession as tenant at will to the true owner, and as remaining such tenant until something happened which might serve to notify the true owner that Booty had ceased to hold as such tenant and was holding adversely to him. What this something would have to be, we do not undertake to specify. We think, however, it would have to be somewhat more than a private attornment to the tenant to another claimant of the land.

And whatever is true of Booty, must be equally true of those deriving title through him.   And the tenant, Griffin, derives his title, as against Zettler, through him, so far as that title depends on possession.

So, there must be a new trial.